1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BARON & BUDD, P.C.**
Scott Summy (pending *Pro Hac Vice*)
(Texas Bar No. 19507500)
John P. Fiske (SBN 249256)
Celeste Evangelisti (SBN 225232)
603 Coast Hwy, Suite G
Solana Beach, California 92075
Telephone:  (214) 521-3605
Fiske@BaronBudd.com

**GOMEZ TRIAL ATTORNEYS**
John H. Gomez (SBN 171485)
Deborah Dixon (SBN 248965)
655 West Broadway, Suite 1700
San Diego, California 92101
Telephone:  (619) 237-3490
DDixon@GomezTrialAttorneys.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

RONALD COX, individually; VICTOR COX, individually; and ADAM COX, individually, by and through his durable power of attorney, VICTOR COX;

            Plaintiffs,

      v.

AMETEK, INC., a Delaware corporation; THOMAS DEENEY, individually; and DOES 1 through 100, inclusive,

            Defendants,

      v.

MELODY ANNE COLE, individually; STEPHANIE MARIE WILSON, individually,

            Nominal Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.:  **'17CV1211 AJB KSC**

**CLASS ACTION COMPLAINT FOR:**

   **1.  Wrongful Death**


**DEMAND FOR A JURY TRIAL**

Plaintiffs, RONALD COX, individually; VICTOR COX, individually; and ADAM COX, individually, by and through his durable power of attorney, VICTOR COX, allege the following based on information and belief:

## PARTIES

1.   Plaintiff RONALD COX ("Ron") is an adult son of decedent Arla, and resides in San Diego, California.  He brings this action as an heir to the decedent pursuant to California Code of Civil Procedure §377.60.

2.   Plaintiff VICTOR COX ("Victor") is an adult son of decedent, ARLA COX ("Arla"), and resides in Prescott Valley, Arizona.  He brings this action as an heir to the decedent pursuant to California Code of Civil Procedure §377.60.  Victor is also the attorney in fact, pursuant to a durable power of attorney, for his adult, incompetent brother, Plaintiff Adam Cox.

3.   Plaintiff ADAM COX ("Adam") is an adult son of decedent, Arla, and resides in Prescott Valley, Arizona. Victor Cox brings each and every allegation as attorney in fact, pursuant to a durable power of attorney, for his incompetent brother, Plaintiff Adam, pursuant to Plaintiff Adam's standing as an heir to the decedent pursuant to California Code of Civil Procedure §377.60.

4.   Defendant AMETEK, INC. is a corporation organized and existing under the laws of Delaware with its principal place of business at 1100 Cassatt Road, Berwyn, Pennsylvania 19312 ("AMETEK").

5.   Defendant THOMAS DEENEY is a natural person who resides in Pennsylvania and who is a corporate officer and employee of Defendant AMETEK, INC.   Defendant THOMAS DEENEY is responsible by act or omission, gross negligence, negligence or otherwise, for the occurrences herein alleged, and for Plaintiffs' resulting harm. At times relevant to this Complaint, Defendant THOMAS DEENEY acted as the agent, servant, and/or employee of AMETEK, and was acting within the course and scope of said agency and employment.

6.   Unless otherwise indicated, the use of any Defendant's name in this

Complaint, including "Defendants," includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives and insurers of the named Defendants.

7.     The true names and capacities of the defendants named herein as Does 1 through 100, inclusive, whether individual, corporate, governmental, associate or otherwise, are unknown to Plaintiffs, who therefore sues such Defendants by fictitious names.  Plaintiffs will amend this complaint to allege their true names and capacities when ascertained.  Each of the Doe Defendants is responsible in some manner, either by act or omission, strict liability, fraud, negligence or otherwise, for the occurrences herein alleged, and Plaintiffs' harm was legally caused by conduct of the Doe Defendants.  Does 1 through 100, inclusive, are responsible to Plaintiffs on the facts and theories herein alleged.   At all relevant times, each Defendant, including those fictitiously named, was the agent, servant, and/or employee of each of the remaining Defendants, and was acting within the course and scope of said agency and employment.  Each of the Defendants is in some manner responsible for the events and happenings to which reference is made herein, and each Defendant caused injury and damage to Plaintiffs as herein alleged.  The acts of Defendants and each of them were and are the acts of the other Defendants. Defendants, and each of them, ratified, authorized, and/or approved of the acts of the other Defendants.

8.     MELODY ANNE COLE and STEPHANIE MARIE WILSON are the adult daughters of decedent Arla Cox, and they are named herein as nominal defendants since, at the time of filing this complaint, Plaintiffs are uncertain whether they intend to pursue the wrongful death claim set forth herein.  Plaintiffs do not allege that the persons named herein as nominal defendants did anything wrong or caused any harm to Arla Cox,  but rather have named them in this lawsuit as nominal defendants only because that is what the law requires under these circumstances.

///

///

## JURISDICTION AND VENUE

9.     Diversity Jurisdiction exists under 28 U.S.C. §1332 because Plaintiff is a resident of California, but all Defendants are residents of or have principal places of business in states outside of California.

10.     Venue is proper in this Court in that the subject acts and transactions giving rise to this action occurred in the Southern District of California for the following reasons:

 a. Defendants do or did conduct business in the Southern District of California and have intentionally availed themselves of the laws and markets within Southern District of California by owning and operating, or having owned and operated, the subject aerospace plant which is the source of the subject contamination, at 790 Greenfield Drive in El Cajon, California;

 b. The injury and harm to Plaintiffs occurred within the Southern District of California in the City of El Cajon.

 c. The toxic groundwater plume, which is the subject of this lawsuit, is within the Southern District of California.

 d. Three "Related" actions are currently filed in the Southern District of California, and this case should be Related to those actions.

 e. All property at issue located with the Southern District of California.

## FACTUAL ALLEGATIONS

**Ametek's History**

11.     In 1953 or 1954, the business located on the El Cajon, California site at 790 Greenfield Drive, El Cajon, California 92021 ("the AMETEK PROPERTY"), was founded by California Aircraft Products.  In 1964, California Aircraft Products changed

1    its name to Straza Industries, which was purchased by Defendant AMETEK in 1968.[1]

2        12.    AMETEK used the AMETEK PROPERTY to manufacture aircraft engine

3    parts from 1968 to 1988.[2]

4        13.    As early as 1988, AMETEK learned it had created a groundwater plume

5    contaminated with chlorinated solvents, including TCE at 39,000 ug/L, as a result of

6    AMETEK's practice of dumping/storing toxic waste in a redwood sump, which leached

7    and leaked chlorinated solvents, among other chemicals, into the groundwater and

8    subsurface soil at the AMETEK PROPERTY.   By 1988, AMETEK knew the

9    contaminated groundwater plume had migrated from its property and into the

10   downgradient groundwater beyond its western property boundary.

11       14.    In late 1988, AMETEK "spun off" a company called Ketema.  The "spin

12   off" included the property and business at 790 Greenfield Drive, from which the toxic

13   plume was emanating.   Ketema eventually changed its name to Schutte & Koerting,

14   which filed for bankruptcy in 2007.

15       15.    Ketema is Ametek spelled backwards.

16       16.    Prior to and at the time AMETEK spun off Ketema, AMETEK knew it had

17   contaminated the groundwater with TCE concentrations as high as 39,000 ug/L.

18       17.    Currently, the AMETEK PROPERTY is owned by Senior Operations,

19   LLC, apparently doing business as Senior Aerospace Ketema, which has its principal

20   place of business at 790 Greenfield Drive, El Cajon, California 92021.

21       18.    Despite knowledge of groundwater contamination at extremely high levels,

22   AMETEK made a cold, calculated business decision to simply walk away from this

23

24   _____

25   [1] California Regional Water Quality Control Board, San Diego Region, Technical
     Analysis, Administrative Liability Complaint No R9-2008-0033, Issued to Ametek, Inc.,
26   Former Ametek/Ketema Aerospace Manufacturing Facility, 790 Greenfield Drive, El
     Cajon, California, San Diego County, For Violation of Cleanup and Abatement Order
27   No, R9-2002-201, dated September 2008.
     [2] *Id.*
28

community without any effort to clean up or remediate the groundwater contamination it had created.

**AMETEK Dumped Chlorinated Solvents into a Hole in the Ground**

19.    By at least 1963, but probably as early as 1952, Straza/AMETEK had dug a hole in the ground to dump and/or store its toxic waste.  The hole was 12 feet in diameter and 10 feet deep, and was used as a waste "SUMP."[3]

20.    Straza/AMETEK lined the walls of the SUMP with redwood planks and poured concrete at its base.

21.    In 1963, Straza/AMETEK submitted a Report of Waste Discharge (ROWD) to the California Regional Water Quality Control Board in order to receive authority and permission to use the SUMP as an impervious storage vessel.  AMETEK represented to the Regional Water Quality Control Board that their waste storage facility would "prevent filtering into native soil" in a February 7, 1963 letter.[4]

22.    AMETEK did not reveal the nature or design of the SUMP, excluding the details that the SUMP was lined with redwood planks. It was not until removal of the SUMP, decades later, that the San Diego County Department of Environmental Health discovered and photographed the redwood planks.[5]

23.    AMETEK used this SUMP for toxic waste storage and dumping until 1985.[6]

---

[3] California Regional Water Quality Control Board, San Diego Region, Technical Analysis, Administrative Liability Complaint No R9-2008-0033, Issued to Ametek, Inc., Former Ametek/Ketema Aerospace Manufacturing Facility, 790 Greenfield Drive, El Cajon, California, San Diego County, For Violation of Cleanup and Abatement Order No, R9-2002-201, dated September 2008.
[4] *Id.*
[5] *Id.*
[6] *Id.*

24.     For over 22 years, between at least 1963 and 1985, Straza/AMETEK dumped up to 7,000 gallons of waste per month into this SUMP.  This dumped waste included[7]:

      a.     Spent acid and alkaline solutions

      b.     Industrial chlorinated solvents

      c.     1, 1, 1- Trichloroethane (1, 1, 1- TCA)

      d.     Trichloroethylene (TCE)

      e.     Tetrachloroethylene (PCE)

      f.     Oils

      g.     Paint thinner

      h.     Process Sludge

25.     Highly acidic liquid waste, spent chlorinated solvents, and appreciable amounts of various metallic wastes breached the sump and discharged into soil surrounding the sump and into the groundwater, as AMETEK dumped the chlorinated solvent waste into the SUMP until 1985.[8]

26.     Between at least 1963 and at least 1985, the strong, acidic liquid waste deteriorated the SUMP allowing the chlorinated solvent waste to seep and percolate directly into the surrounding soil, fractures in the granite rock, and into the groundwater.[9]

27.     In 1987, total chlorinated solvent concentrations in the groundwater near the SUMP exceeded 810,000 parts per billion (ppb).[10]

28.     In 2007, total chlorinated solvent concentrations in the groundwater near the SUMP exceeded 48,000 parts per billion (ppb).[11]

---

[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.*

29.    The 1987 and 2007 concentration levels exceed state water quality objectives by unthinkable magnitudes.  A chart from the Regional Water Board's 2008 Administrative Liability Complaint illustrates the excessive pollution caused by AMETEK:[12]

Table 1

| Waste Constituent | Ground-Water Concentration [a] (ug/l) | Basin Plan Water Quality Objective (ug/l) |
|---|---|---|
| Tetrachloroethylene (PCE) | 5,400 | 5 |
| Trichloroethylene (TCE) | 40,000 | 5 |
| 1,1-Dichloroethylene (1,1-DCE) | 1,300 | 6 |
| 1,1,1 – Trichloroethane (1,1,1-TCA) | 270 | 200 |
| 1,4 - Dioxane | 800 | 3* |

\* California Department of Public Health advisory Notification Level (NL).
[a] Data from the December 2007 Groundwater Monitoring Report.

**One of the Largest TCE Plumes in the State of California**

30.    AMETEK'S waste discharge has caused one of the largest TCE/chlorinated solvent plumes in the State of California.[13]

31.    The chlorinated solvent plume is massive, extending up to 1.3 miles westward and down-gradient.  The plume includes the following chemicals and dimensions[14]:

a.    TCE: 7,000 feet by 1,600 feet, migrated beneath 257 acres of land

b.    DCE: 3,200 feet by 1,200 feet, migrated beneath 88 acres of land

c.    Dioxane: 5,600 by 1,000 feet, extends across 128 acres of land

d.    TCA: 1,200 feet by 400 feet, extends beneath 11 acres

---

[12] *Id.*
[13] *Id.*
[14] *Id.*

32.     Additionally, plumes of PCE, 1,1-DCA, benzene, toluene, ethylbenzene, and xylene exist in the groundwater.[15]

33.     According to AMETEK'S own environmental consultants, Environmental Resources Management ("ERM"), the plume has contaminated the groundwater and soil beneath Magnolia Elementary School, the Greenfield, Starlight and Villa Cajon mobile home parks, and other neighboring properties.

**Toxic Health Effects**

34.     The Agency for Toxic Disease Registry and U.S. Environmental Protection Agency provide information for some of the present in AMETEK's massive contamination plume[16]:

a. TCE: *Affected Organ Systems*: Developmental (effects during periods when organs are developing), Neurological (Nervous System); *Cancer Classification*: NTP: Reasonably Anticipated to be a Human Carcinogen; EPA: Carcinogenic to humans; IARC: Carcinogenic to humans (**evidence for cancer is based on kidney cancer**, limited evidence for non-Hodgkin lymphoma and liver cancer, as well as, various tumors in animals); *Chemical Classification*: Volatile organic compounds; *Summary:* Trichloroethylene (TCE) is a nonflammable, colorless liquid with a somewhat sweet odor and a sweet, burning taste. It is used mainly as a solvent to remove grease from metal parts, but it is also an ingredient in adhesives, paint removers, typewriter correction fluids, and spot removers. Trichloroethylene is not thought to occur naturally in the environment. However, it has been found in underground water sources and many surface waters as a result of the manufacture, use, and disposal of the chemical.

---

[15] *Id.*
[16] www.atsdr.cdc.gov

b. PCE: *Affected Organ Systems:* Developmental (effects during periods when organs are developing), Neurological (Nervous System), Respiratory (From the Nose to the Lungs); *Cancer Classification:* NTP: Reasonably Anticipated to be a Human Carcinogen; *Chemical Classification:* Volatile organic compounds; *Summary:* Tetrachloroethylene (PCE) is a manufactured chemical that is widely used for dry cleaning of fabrics and for metal-degreasing. It is also used to make other chemicals and is used in some consumer products.

c. TCA: *Affected Organ Systems:* Cardiovascular (Heart and Blood Vessels), Neurological (Nervous System); *Chemical Classification:* Volatile organic compounds; *Summary:* 1,1,1-Trichloroethane is a synthetic chemical that does not occur naturally in the environment. It also is known as methylchloroform, methyltrichloromethane, trichloromethylmethane, and trichloromethane.

d. DCE[17]: *Affected Organ Systems:* Short-term: EPA has found 1,1-DCE to potentially cause the following health effects when people are exposed to it at levels above the MCL for relatively short periods of time: liver damage. Long-term: 1,1-DCE has the potential to cause the following effects from a lifetime exposure at levels above the MCL: liver and kidney damage, as well as toxicity to the developing fetus; cancer; *Summary:* 1,1-DCE will evaporate from soil and will leach into the groundwater where its fate is unknown, but degradation is expected to be slow. Its tendency to accumulate in aquatic life is unknown but expected to be minor.

---

[17] www.epa.gov

e.  Dioxane: *Affected Organ Systems:* Hepatic (Liver), Ocular (Eyes), Renal (Urinary System or Kidneys); *Cancer Classification:* NTP: Reasonably Anticipated to be a Human Carcinogen; *Summary:* 1,4-Dioxane is a clear liquid that easily dissolves in water. It is used primarily as a solvent in the manufacture of chemicals and as a laboratory reagent; 1,4-dioxane also has various other uses that take advantage of its solvent properties.

f.  Vinyl Chloride: *Affected Organ Systems:* Cardiovascular (Heart and Blood Vessels), Developmental (effects during periods when organs are developing), Hepatic (Liver), Immunological (Immune System); *Cancer Classification:* NTP: Known to be a Human Carcinogen; *Chemical Classification:* Volatile organic compounds; *Summary:* Vinyl chloride is a colorless gas. It burns easily and it is not stable at high temperatures. It has a mild, sweet odor. It is a manufactured substance that does not occur naturally. It can be formed when other substances such as Trichloroethane (TCA), trichloroethylene (TCE), and tetrachloroethylene (PCE) are broken down. Vinyl chloride is used to make polyvinyl chloride (PVC). PVC is used to make a variety of plastic products, including pipes, wire and cable coatings, and packaging materials. Vinyl chloride is also known as chloroethene, chloroethylene, and ethylene monochloride.

**Additional/Special Increased Risk to Children and Pregnant Women**

35.  Young children 10 years and younger, and pregnant women and their unborn babies, are especially susceptible and vulnerable to toxic exposure and associated risk thresholds are higher for children and pregnant women.

36.  The U.S. Department of Health and Human Services, Agency for Toxic Substances and Disease Registry, published *ATSDR Case Studies in Environmental Medicine, Principles of Pediatric Environmental Health- The Child as Susceptible Host:*

*A Developmental Approach to Pediatric Environmental Medicine, Course: WB2089,* which explains:

  a.  "Childhood is a time of rapid growth and development. It is accompanied by changes in organ system functioning, metabolic capabilities, physical size, and behavior that can dramatically modify the effects, the illness, or both caused by toxicant exposure. Pediatricians and other clinicians caring for children need to understand these special susceptibilities."

  b.  "Children may ingest or inhale dirt or dust contaminated with… environmental toxicants during play or other normal activities. Questions could include exposures to indoor air and outdoor air pollutants and contaminated drinking water and soil."

  c.  "Soil intake ranged from a minimal estimate of 108 milligrams (mg)/day to a maximum of 1,834 mg/day of soil…."

  d.  "Children usually have increased exposures per kilogram of body weight, compared to adults."

  e.  "Children's dynamic growth and development puts them at increased risk from environmental toxicants."

  f.  "Special consideration must be given to toxic exposures during fetal life, infancy, childhood, and adolescence."

  g.  "Because children grow and develop, they have a higher metabolic rate and thus have a greater need for oxygen….. Children breathe more air… per kilogram of body weight than do adults. These result in greater exposures per kilogram of body weight to any contaminants in the air…."

  h.  "Children have an increased surface area-to-body mass ratio (in infants and young children) resulting in an increased risk of dermal exposure and absorption."

i.   "Children's long life expectancy increases their risk of adverse outcomes (e.g., cancer, renal or liver failure, senility) from exposures to those toxicants whose effects are expressed after a long latency period."

j.   "The rapid development of organ systems during embryonic, fetal, infant, and early childhood periods make children vulnerable when exposed to environmental toxicants."

k.   "Parental exposures before a child is conceived can result in adverse reproductive effects, including Infertility, Spontaneous abortion, and Genetic damage to the fetus, possibly resulting in birth defects."

l.   "Exposures to hazardous substances during pregnancy can potentially affect the development of fetal organ systems."

m.   "Exposures can cause profound systemic damage out of proportion with the dose response seen in adults."

n.   "A fact of fetal life is that the fetus cannot escape transplacental transport of toxicants to which the mother is exposed."

37.   The California Regional Water Quality Control Board filed a 2008 Administrative Liability Complaint against Defendant AMETEK, INC. for failing to comply with the previous 2002 Cleanup and Abatement Order No. R9-2002-201.[18] AMETEK, INC. committed the following violations[19]:

38.   The California Regional Water Quality Control Board then imposed a fine of $2,269,000 for the above mentioned violations[20]:

a.   "$1,671,500 in liability for Failure to Report as Required by Directive No. 1…."

---

[18] *Id.*
[19] *Id.*
[20] *Id.*

b. "$597,500 in liability for Failure to Submit a Complete Feasibility Study Report as Required by Directive No. 3…."

**AMETEK'S Water Quality Violations**

39.   AMETEK was named a "Responsible Party" in Cleanup and Abatement Order 98-11 in 1998 by the California Regional Water Quality Control Board ("CRWQCB").   AMETEK was required, among other things, to fully delineate the plume, submit a Feasibility Study, submit a Remedial Action Plan, and otherwise fully comply with CAO 98-11.

40.   AMETEK was again named a "Responsible Party" in Cleanup and Abatement Order 02-201 in 2002 by the CRWQCB.   AMETEK was required to complete delineation of the plume, develop and submit a groundwater management plan, prepare a feasibility study, and submit a groundwater model work plan.

41.   AMETEK was again named a "Responsible Party" in Cleanup and Abatement Order 02-201

42.   AMETEK and DEENEY choose to not comply with CAO 98-11 or CAO 02-201.

43.   AMETEK and DEENEY knowingly, willfully, and intentionally failed to comply with either CAO 98-11 or CAO 02-201.

44.   The California Regional Water Quality Control Board filed a 2008 Administrative Liability Complaint against Defendant AMETEK, INC. for failing to comply with the previous 2002 Cleanup and Abatement Order No. R9-2002-201.[21]   Per the 2008 Administrative Liability Complaint, AMETEK, INC. committed the following violations[22]:

a.   Failure to Report as Required by Directive No. 1: "Ametek failed to install and collect ground-water samples in accordance with

---

[21] *Id.*

[22] *Id.*

Directive 1.e and failed to submit a complete Delineation Report by April 30, 2003..... the total number of days of violation is 1,974 days."

    b.   Failure to Submit a Complete Feasibility Study Report as Required by Directive No. 3: "Ametek failed to submit a complete Feasibility Study Report by January 16, 2004..... the total number of days of violation is 1,713 days."

45.   The 2008 Administrative Liability Complaint, also documented AMETEK'S willful, knowing, and intentional failures as follows[23]:

    a.   "After 20 years of investigation efforts, Ametek and S&K have not installed a sufficient monitoring well network to delineate the vertical and horizontal extent of the waste plume and have not taken any efforts to cleanup and abate the effects of their discharge."

    b.   "Ametek and S&K are responsible for delineating and remediating the discharge of wastes."

    c.   "Ametek and S&K were repeatedly advised that their submittals regarding plume delineation were incomplete or deficient, yet they failed to conduct additional work to address the deficiencies."

    d.   "Ametek and S&K's failure to completely delineate the plume has allowed significant concentrations of contaminants to remain in place as a continued source of pollution."

    e.   "Ametek and S&K failed to act appropriately, not only in their efforts to complete the delineation of the plume, but in their responsibilities to implement appropriate cleanup and abatement measures in a reasonable amount of time."

---

[23] Technical Analysis for Administrative Liability Complaint No. R9-2008-0033, September 2008.

f.  "Such failures have caused a condition of pollution and contamination in the ground water beneath the El Cajon Valley with continuing impacts to the existing beneficial uses of the Santee/El Monte Basin."

46.   The CRWQCB sent numerous letters and Notices of Violation ("NOVs") to AMETEK and DEENEY regarding the lack of compliance with CAO 98-11 and CAO 02-201.   AMETEK and DEENEY simply ignored the CRWQCB letters and NOVs, allowing the plume to continue to contaminate properties, including causing vapor intrusion into the mobile homes like the ones owned by decedent Arla Cox.

**Magnolia Elementary School - An Adjacent Property**

47.   On June 1, 2015, the Board of Governors of the Cajon Valley Union School District voted unanimously to close Magnolia Elementary School, another property located adjacent to the three mobile home parks, for the 2015-2016 school year because the indoor air was contaminated with toxic chemicals emanating from the AMETEK contamination plume.

48.   To mitigate the intrusion of TCE vapors into indoor air at Magnolia Elementary School, Cajon Valley Union School District installed sub-slab depressurization systems, designed to remove toxic vapors from underneath classroom buildings.

49.   In 2008, the Department of Toxic Substances Control (DTSC) entered into a Consent Order with AMETEK, documenting the following[24]:

a.  "In June 2007, samples taken from ground water monitoring wells showed concentration of TCE of up to 50,000 micrograms per liter beneath the former Ketema facility, and up to 3,600 micrograms per liter beneath the Site."[25]

---

[24] Consent Order, Department of Toxic Substances Control, California Environmental Protection Agency, Docket No. HAS-CO 07/08-198, 2008.
[25] "Site" means Magnolia Elementary School.

b. "The corresponding modeled indoor air exposure at this level corresponds to a lifetime cancer risk in excess of one-in-ten-thousand ($10^{-4}$) at the Site.  The TCE groundwater plume is impacting the Site."

c. "Soil gas and indoor air quality sampling conducted between July 2004 and August 2005 at the Site showed TCE concentrations in the subsurface at up to 130 parts per billion by volume and inside the classrooms at levels up to 1.6 micrograms per cubic meter, as reported in "Results of Soil Vapor and Air Testing" dated May 27, 2005, and the "Results of Indoor Air Sampling" dated August 26, 2005."

d. "Exposure at this level corresponds to a lifetime cancer risk in excess of one-in-a-million ($10^{-6}$)."

50.    In 2008, the DTSC identified the "Health Effects" of the chlorinated solvents and chemicals AMETEK had dumped into its SUMP[26]:

a. "Volatile Organic Compounds (VOCs) detected at the former Ketema facility and the Site include: 1) benzene, 2) chlorinated solvents, such as TCE, PCE, and 1,1 DCE."

b. "Exposure to such chemicals may occur by inhalation of vapors coming from soil and groundwater, as well as ingestion of, and dermal contact with, VOCs in soil or water."

c. "Potential health effects include cancer, liver and kidney damage, respiratory impairment and central nervous system effects."

51.    In 2008, the DTSC identified the "Routes of Exposure" of those chlorinated solvents and chemicals[27]:

a. "Certain activities conducted at the former Ketema facility have contaminated soil and groundwater.  Because the contaminants found on

---

[26] *Id.*
[27] *Id.*

the former Ketema facility and under the Site include VOCs, an assessment of all exposure routes will be conducted."

b. "The potential routes of exposure include inhalation, ingestion, and dermal contact."

52.   In 2008, the DTSC also identified the "Public Health and/or Environmental Risks"[28]:

a. "Contaminants have been found in the soil and groundwater at the former Ketema facility and the Site.  Risks from these contaminants may be caused by exposure to soil vapor, soils and/or groundwater, through ingestion, inhalation of dusts, and/or vapors, and dermal contact."

b. "The groundwater is relatively shallow at the Site and indoor from groundwater via soil vapor was confirmed at the Site."

53.   Since 2012, the DTSC has recommended quarterly monitoring of indoor air quality in classrooms and quarterly monitoring of soil gas at Magnolia Elementary School, located adjacent to Greenfield, Starlight and Villa Cajon, the real property upon which Plaintiff's mobile home is situated.[29]

54.   In November 2014, the DTSC evaluated indoor air quality test results:[30]

a. "Detection of TCE within one room (Room 8) exceeded the accelerated response action level for residential exposure scenarios (2 ug/m3)...."

b. "PCE was detected in indoor air within several rooms, with one detection in Room 19 (3.1 ug/m3) exceeding DTSC's modified air screening level for industrial exposure scenarios (2.08 ug/m3) and two

---

[28] *Id.*
[29] Letter to Mr. James Beard, Cajon Valley School District, from Shahir Haddad, P.E., Supervising Engineer, Department of Toxic Substances Control, November 17, 2014.
[30] *Id*, attached Memorandum, SOIL VAPOR SURVEY AND INDOOR AIR QUALITY ASSESSMENT, From Patrick Kerzic, PhD, DABT, Staff Toxicologist, November 3, 2014.

detections (Rooms 11 and 19) exceeding DTSC's modified air screening level for residential exposure."

    c.  "Analysis of several indoor air contaminants (PCE, TCE, 1,1-DCE, 1,1,1-TCA, and 1,1-DCA) which likely appear in indoor air due to vapor intrusion and are found in nearby soil vapor wells, using a Schools Risk Screening Model (Schoolscreen, developed by the Office of Environmental Health Hazard Assessment (OEHHA)) indicates that both cancer risks and health hazards to on site staff and students may approach or exceed DTSC's points of departure for cancer risk (1 in one million excess risk) and hazards (hazard index of 1.0)."

55.   In November 2014, the DTSC made conclusions and recommendations: [31]

    a. "Recent sampling of indoor and ambient air is consistent with vapor intrusion from contaminants in the subsurface into classrooms at Magnolia Elementary School."

    b. "Precautionary actions should be taken to increase ventilation in all classrooms."

    c. "In order to confirm detections of contaminants within indoor air, an additional round of air sampling should be performed as soon as possible."

    d. "HERO (Human and Ecological Risk Office) supports the recommendation of a human health risk assessment for staff and students at Magnolia Elementary School."

56.   In December 2014, indoor air quality was tested at Magnolia Elementary School, and the results showed a spike in indoor air vapor intrusion.

57.   On May 7, 2015, the DTSC held a Community Update Meeting for Magnolia Elementary School, at which several teachers and parents of Magnolia

---

[31] *Id.*

students attended.   The DTSC interpreted results from the December 2014 vapor intrusion test results.

58.   As part of the meeting, the DTSC gave a presentation, including the following slides and information[32]:

59.



60.



[32] Presentation at Community Update Meeting for Magnolia Elementary School, Schools Evaluation and Brownfields Outreach, California Department of Toxic Substances Control, May 7, 2015.

61.

## Previous Sampling Events and Results

|  | Cancer Risk | Additional Risk in One Million |
|---|---|---|
| August 2014 | $4.5 \times 10^{-6}$ | 4.5 |
| December 2014 | $4.2 \times 10^{-5}$ | 42 |
| March 2015 | $5.6 \times 10^{-6}$ | 5.6 |



Department of Toxic Substances Control

62.

## DTSC's Risk Management Range

Highest cancer risk estimated Dec 2014: $4.2 \times 10^{-5}$

| $10^{-6}$ | $10^{-5}$ | $10^{-4}$ |
|---|---|---|

ACCEPTABLE — No Further Action

THE SITE SPECIFIC CONDITIONS DRIVE THE DECISION

UNACCEPTABLE — Further Action Required

Highest cancer risk estimated March 2015: $5.6 \times 10^{-6}$

Source: DTSC Vapor Intrusion Public Participation Advisory

Department of Toxic Substances Control

63.     The cancer risk for the December 2014 and the March 2015 levels were above the "ACCEPTABLE" range and entering the red zone.  The cancer risk for the December 2014 levels were in the red.

64.     The cancer risk appeared to reach levels 42 times the threshold level which guides the DTSC to take action.

**Greenfield, Starlight, and Villa Cajon Mobile Home Parks**

65.     Greenfield is a mobile home park located due west of the AMETEK PROPERTY.  As such, Greenfield is directly west and down-gradient of the AMETEK SUMP.

66.     Starlight is a mobile home park located due west-northwest of the AMETEK PROPERTY.   As such, Starlight is northwest and down-gradient of the AMETEK SUMP.

67.     Villa Cajon is a mobile home park located due west-northwest of the AMETEK PROPERTY.  As such Villa Cajon is west-northwest and down-gradient of the AMETEK SUMP.  Decedent Arla was a resident in the Villa Cajon mobile home park from approximately 1976 until her death in 2001.

68.     According to AMETEK's own environmental consultants, ERM, the chlorinated solvent plume, including TCE and other chemicals, flows directly underneath the Greenfield, Starlight, and Villa Cajon mobile home parks ("MHPs").

69.     Groundwater Monitoring Wells (MW) have been placed around the mobile home parks: upgradient, downgradient, north, and south of the mobile homes.  TCE concentrations sampled from these groundwater MWs assist in identifying the TCE plume underneath the mobile home parks.  Below are examples of TCE concentrations surrounding the mobile home parks:

      a. MW-40 in 2016, upgradient of MHPs and adjacent to Starlight: 81,000 ug/L.

      b. MW-16 in 2011, upgradient of and adjacent to MHPs: 5,600 ug/L.

      c. MW-18 in 2012, downgradient of MHPs: 1,200 ug/L.

d.   MW-46B in 2015, upgradient of and adjacent to MHPs: 9,500 ug/L.

e.   MW-46C in 2013, upgradient of and adjacent to MHPs: 11,000 ug/L.

70.   AMETEK's consultants document groundwater contamination of TCE and other chemicals underneath the Greenfield, Starlight, and Villa Cajon MHPs.

71.   TCE and other chlorinated solvent chemicals at and underneath 790 Greenfield Drive continue to cause groundwater contamination on a daily basis—the contaminated groundwater flows down-gradient and westward into and beneath the Greenfield, Starlight, and Villa Cajon MHPs.

**Vapor Intrusion at the Mobile Home Parks**

72.   Despite the plume's existence for over 40 years, and despite the existence of a Cleanup and Abatement Order since 1998, the first indoor air and crawl space vapor sampling did not take place at the mobile home parks adjacent to the AMETEK PROPERTY until February 2017, after two related lawsuits were filed.

73.   The CRWQCB required AMETEK, as the Responsible Party, to sample the air and crawl space of mobile homes at Greenfield and Starlight MHPs. The positive results from that air sampling became known to Plaintiff in March 2017. This was the first time the mobile homes were tested for vapor intrusion.

74.   Of 17 mobile homes tested by Ametek, all 17 tested positive for TCE vapor intrusion into the indoor air and crawlspace.

75.   The results of the mobile home sampling revealed TCE vapor intrusion into the indoor air and crawl space at **levels up to 32 ug/m$^3$ and 29 ug/m$^3$**, respectively. These results, in addition to other results, far exceed the California residential screening level of .48 ug/m$^3$, and/or the Accelerated Response Action Level of 2 ug/m$^3$, and/or the Urgent Response Action Level of 6 ug/m$^3$.

76.   The California screening level of .48 ug/m$^3$ is calculated as three times the 90th percentile of all TCE air tests collected and reported in California in the past five years.

77.   Thus, TCE vapor intrusion is documented in the indoor air and crawl space

of mobile homes at the mobile home parks.  Decedent Arla's Unit 111 (and her previous Unit 110), was and is situated directly above the same groundwater contamination plume causing this indoor air intrusion.

78.   Continuous groundwater contamination is occurring and has occurred every day for at least the past 40 years due to a currently constant source of chemicals underneath 790 Greenfield Drive.  The current constant source of chemicals underneath 790 Greenfield Drive continuously contaminates the groundwater as it passes westward underneath 790 Greenfield Drive property and into and beneath the real property upon which decedent Arla's mobile home residences were located, causing vapor intrusion into decedent Arla's mobile home crawl space and indoor air.

79.   Defendants know and have known that 790 Greenfield Drive, including the subsurface soil, alluvium, decomposed granite, and/or granitic bedrock, are contaminated with TCE and other toxic chemicals.  Defendants know and have known that TCE and other toxic chemicals on and beneath 790 Greenfield Drive have been and continue to contaminate the groundwater as it passes through the property's subsurface soils on underneath the subject mobile home park properties, and despite this knowledge, Defendants have consciously ignored the risk of further contamination and the risk to human health and have chosen not to clean up or remediate the TCE and other toxic chemicals.

**Direct Harm to Decedent Arla Cox**

80.   Arla Cox is the mother of five children, Plaintiffs Ron, Victor and Adam, and nominal defendants Melody Anne Cole and Stephanie Marie Wilson.  Plaintiffs Ron, Victor and Adam were dependent upon their mother for love, care, comfort, society, emotional support, financial support and guidance.

81.   Arla Cox owned Unit 110 at the Villa Cajon mobile home park starting in approximately 1976.  In approximately 1986, Arla Cox sold unit 110 and purchased and moved into Unit 111 with her son, Plaintiff Adam.

82.     Prior to her death in 2001, Arla Cox, a non-smoker, was diagnosed with a kidney tumor, which lead to and was the cause of her death.

83.     Plaintiffs are informed and believe that Arla Cox's mobile home units at Villa Cajon spaces 110 and 111 were both contaminated with vapors, including but not limited to TCE, emanating from the toxic plume created by AMETEK, for the entire duration that she resided in those units.

84.     As of 2001, Arla had lived over the toxic TCE plume created by AMETEK for 36 years.

85.     Kidney cancer is one of the known effects of toxic exposure to TCE.

86.     Sadly, Arla Cox died on June 16, 2001, from the kidney tumor she had developed.  She was 63 years old.

87.     Plaintiffs are informed and believe that Arla Cox's kidney tumor and subsequent death were a direct result of her decades long exposure to toxic TCE vapors emanating from the contamination plume created by Defendants AMETEK and DEENEY.

88.     Further, as a direct result of AMETEK and DEENEY's outrageous conduct in, first, creating the toxic plume under Arla's mobile home units, and, second, overtly and callously refusing to clean up and abate the known contamination, Plaintiffs suffered damages due to the wrongful death of their mother, Arla.

89.     THOMAS DEENEY, acting within the course and scope of his employment with AMETEK, responsible for decision making and capable of binding AMETEK, did personally and consciously ignore official State of California Cleanup and Abatement Orders, official State of California Notices of Violation, and many letters from the State of California regarding failure to delineate the toxic groundwater plume as a step towards remediation, thereby consciously allowing the plume to continue to grow, thereby causing additional harm.

90.     Despite receiving such Cleanup and Abatement Orders, Notices of Violation and letters regarding AMETEK's failure to delineate the plume, AMETEK

and DEENEY consciously ignored such correspondence, with knowledge of legal violations and knowledge of a toxic plume, thereby causing additional harm.

91. Despite such knowledge, Defendants consciously ignored the continuous release and contamination of groundwater and vapor intrusion, directly resulting in decedent Arla's death.

## **DELAYED DISCOVERY AND EQUITABLE TOLLING**

92. At all times relevant herein, Defendants concealed relevant facts that would have allowed Plaintiffs to discover the true nature and degree of the waste dumping, groundwater contamination, soil contamination, and vapor intrusion. As a result of these concealments and misrepresentations, equitable tolling of the statute of limitations applies as to the claims asserted by Plaintiffs. Any applicable statute of limitations that might otherwise bar certain of the claims at issue should be tolled because Defendants actively misled Plaintiffs with respect to the true nature, quality, and hazards of use of the waste dumping, groundwater contamination, and vapor intrusion as described herein and above.

93. Plaintiffs exercised due diligence to discover Defendants' wrongdoing. However, such wrongdoing and/or the full extent and degree of such wrongdoing was not reasonably discoverable prior to the date of the filing of this action and/or prior to two years prior to the filing of this action since Defendants concealed their wrongdoing through misrepresentation, concealment, and failure to disclose. Plaintiffs exercised due diligence by promptly filing this Complaint after discovering the facts giving rise to these claims.

94. Plaintiffs did not discover toxic vapor intrusion at the MHPs until very recently, in March 2017, and certainly within the past two years, only after the California Regional Water Quality Control Board released results of indoor air and crawl space vapor testing, which occurred in February and March 2017.

///

///

# FIRST CAUSE OF ACTION

## Wrongful Death

## (All Defendants)

95.     Plaintiffs hereby re-allege and incorporate by reference each and every allegation contained herein above, as if fully set forth in detail herein.

96.     Pursuant to California *Code of Civil Procedure* §377.60, Plaintiffs Ron, Victor and Adam, as the adult living children of decedent Arla, have the right to bring a cause of action for the death of their mother, Arla, caused by the wrongful acts or neglect of another, and can assert that cause herein.

97.     As alleged above, Plaintiffs Ron, Victor and Adam were dependent upon their mother for love, care, comfort, society, emotional support, financial support and guidance.

98.     Plaintiffs Ron, Victor and Adam are informed and believe, and thereon allege, that as a proximate result of the tortious, wrongful, negligent, and/or reckless conduct of Defendants AMETEK, DEENEY, and/or DOES 1-100, and each of them, their mother died on June 16, 2001.  Her death was the direct result of the kidney tumor which she developed due to decades long exposure to toxic TCE vapors emanating from Defendants' contamination plume, and Defendants' outrageous conduct was a substantial factor in Arla's death.

99.     As a direct and proximate result of the tortious, wrongful, negligent and/or reckless conduct of Defendants AMETEK, DEENEY, and/or DOES 1-100, and each of them, which resulted in the death of Arla, Plaintiffs Ron, Victor and Adam suffered severe loss and are forever deprived of the love, care, comfort, society, emotional support, financial support and guidance of their mother, Arla, in an amount according to proof at trial.

100.    As a further proximate result of the conduct of Defendants, and each of them, Plaintiffs Ron, Victor and Adam incurred funeral and burial expenses as well.

///

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray for judgment against Defendants on all causes of action, and each of them, as follows:

1.  For compensatory and general damages according to proof;

2.  For special damages according to proof;

3.  For costs of suit as permitted by law;

4.  For attorneys' fees as permitted by law;

5.  For all such other and further relief as the Court deems just.

DATED:  June 14, 2017                    Respectfully Submitted,


By:  s/ John P. Fiske
         John P. Fiske

**BARON & BUDD, P.C.**
Scott Summy (pending *Pro Hac Vice*)
(Texas Bar No. 19507500)
John P. Fiske (SBN 249256)
Celeste Evangelisti (SBN 225232)
603 Coast Hwy, Suite G
Solana Beach, California 92075
Telephone:  (214) 521-3605
Fiske@BaronBudd.com

**GOMEZ TRIAL ATTORNEYS**
John H. Gomez (SBN 171485)
Deborah Dixon (SBN 248965)
655 West Broadway, Suite 1700
San Diego, California 92101
Telephone:  (619) 237-3490
DDixon@GomezTrialAttorneys.com

*Attorneys for Plaintiffs*

1

**Trial by Jury**

2     Pursuant to the Seventh Amendment to the Constitution of the United States of

3  America, Plaintiff is entitled to, and demands, a trial by jury.

4

5  DATED:  June 14, 2017                    Respectfully Submitted,

6

7

                                      By:  s/ John P. Fiske
8                                            John P. Fiske

9

10                                    **BARON & BUDD, P.C.**
                                      Scott Summy (pending *Pro Hac Vice*)
11                                    (Texas Bar No. 19507500)
                                      John P. Fiske (SBN 249256)
12                                    Celeste Evangelisti (SBN 225232)
                                      603 Coast Hwy, Suite G
13                                    Solana Beach, California 92075
                                      Telephone:  (214) 521-3605
14                                    Fiske@BaronBudd.com
15

16                                    **GOMEZ TRIAL ATTORNEYS**
                                      John H. Gomez (SBN 171485)
17                                    Deborah Dixon (SBN 248965)
                                      655 West Broadway, Suite 1700
18                                    San Diego, California 92101
                                      Telephone:  (619) 237-3490
19                                    DDixon@GomezTrialAttorneys.com
20

21                                    *Attorneys for Plaintiffs*

22

23

24

25

26

27

28